## James Phillips v. St. Louis Perpetual Insurance Company.

A valid abandonment passes the property in the vessel to the underwriters, and from that moment, at least, the captain becomes the agent of the underwriters, and his sale of the vessel, however reprehensible it may be, is made for their account and cannot relieve them from liability.

In estimating the cost of repairs in order to ascertain whether it will exceed fifty per cent of the ship's value, the deduction of one third new for old is not to be made; that rule applies to repairs made in certain cases of partial, or average losses, and seems to have been extended to a case of technical total loss only by local usage in two or three States.

Where but two thirds of the valuation is insured, the owner is his own underwriter for the balance, and the nett proceeds of the sale of the vessel should be divided as salvage between the parties, in proportion to the amount each had at risk.

APPEAL from the Fifth District Court of New Orleans, *Augustin*, J. *Sage*, for plaintiff. *Hunton & Pike*, for defendants and appellants.

Spofford, J. The plaintiff took from the defendants policies of insurance upon the barque Eleanor and her freight-list at and from the port of New-Orleans to the port of Baltimore. The barque was valued in the policy at $6000, and the insurance upon her was for $4000. Her freight, of the value of $1873 36, was insured for $1225. She took the ground in attempting to cross a bar at the mouth of the Mississippi River, where, at the time, there was a short, chopping sea; the tow-boat had great difficulty in twisting her off the bar, and did some damage by knocking against her, and carrying away her windlass-bitts, and some parts of her tackle. After getting into blue water, it was discovered that she leaked; day after day she encountered heavy gales and seas, and the leak continued to increase; it was finally found necessary to put into the port of Key West, where a survey was called, which resulted in a recommendation that she be discharged; upon another survey, she was reported

unseaworthy, and irreparable save at a cost greater than her value after repairs; the captain forwarded her cargo to Baltimore by another vessel at a charge exceeding the amount of her original freight-list; the agent of the plaintiff in New-Orleans, upon being advised of the facts, made an abandonment to the defendants, which they declined to accept; the Insurance Company, however, sent an agent to Key West, who reported, after another survey called by himself, that the barque was unseaworthy by reason of rottenness in her timbers and fastenings; the captain, after her abandonment to the underwriters, had her sold at auction, when she produced the sum of $1208 02.

This suit was brought by the owner upon both policies, for the amounts insured upon the hull and freight; the defendants have appealed from a judgment against them pursuant to the verdict of a jury.

Both parties having put their case upon its merits before us, we deem it unnecessary to notice the bills of exceptions, any further than they may be incidentally passed upon in this opinion.

The plaintiff bases his demand solely upon the position that there was a constructive total loss by reason of the perils insured against; that is to say, upon the position that, at the time of the abandonment, the damage done to the vessel by means of those perils was such, that the cost of her repairs would have exceeded one half of her value. *Hyde* v. *Louisiana State Insurance Company*, 2 N. S., 410. *Riley* v. *Ocean Insurance Company*, 11 Rob., 258. If so, the abandonment was a valid one and passed the property in the barque to the underwriters, and from that moment at least, the captain became the agent of the underwriters, and his sale of the vessel, however reprehensible it may have been, doubtless was made for their account and cannot relieve them from liability to the assured. 3 Kent's Com., p. 331–2.

We think that the evidence preponderates in favor of the plaintiff, as to the extent of the loss, and that the necessary repairs of the vessel would have cost more than one half of her value, whether we take as a basis the sum at which she was rated in the policy, or her actual value as repaired. It becomes immaterial, then, to decide which is the true test, a question upon which authorities differ, although the better opinion seems to point to the real value as the criterion. 2 Phil. Ins., §1538–9.

In estimating the cost of repairs in order to ascertain whether it will exceed fifty per cent of the ship's value, we are of opinion that the deduction of one third new for old is not to be made; that rule applies to repairs made in cases of partial or average losses, and seems to have been extended to a case of technical total loss only by local usage in two or three States. 3 Kent's Com. *p. 331. *Bradlie* v. *The Maryland Insurance Company*, 12 Peters, 378. 2 Phil. Ins., §1543. For the rule in New York and Mass. see 11 Wend., 453; 16 Pick., 303.

Much testimony has been taken upon the extent of the damage, the purport of which is that the repairs would have cost upwards of $3000.

The defendants, by their course of action, have lent additional weight to this evidence; for, as we have intimated already, the agent whom they sent to Key West with a view to repair the barque and forward her, if possible, to her original port of destination, made no attempt to do so, but held a new survey before she was sold by the captain but after her abandonment by the owner, and reported, thereupon, to his principals that she was unseaworthy from the inception of the voyage, her disasters having been, in the judgment of the surveyors,

occasioned by rottenness and unsoundness of the vessel and her fastenings; upon the faith of this report, it would seem that the defendants have always denied their liability and refused to pay anything to the plaintiff.

If the ship had not been greatly damaged, or damaged to a degree quite sufficient to justify the assured in declining to repair, such a report would hardly have been made by the defendant's agent.

Now, it is proven that the condition of the vessel at Key West was owing to recent external injuries, and not to internal decay. The soundness of her timbers, at the time of her departure from New Orleans, is abundantly established, and the theory of the company's agent as to the cause of her innavigability completely refuted.

She was old, it is true; but the company knew precisely her age, and charged an extra premium on that account.

They say she was overladen and may have been rendered unseaworthy thereby; but the evidence also repels this theory. Numbers of witnesses, including those who knew her best, testify that she was not laden at all beyond her capacity, and the one or two who entertained a different opinion only thought of it upon seeing her after she had experienced the disasters of the voyage.

The only remaining question is, was the injury caused by any of the perils insured against?

It is argued for the defence that her grounding on the bar was an ordinary peril, and, if that was the cause of her disaster, that they are not responsible.

We are of opinion that a combination of causes, which taken together constitute " perils of the sea," led to the breaking up of her voyage. These were: the chopping sea at the time she crossed the bar, the thumping of the steam-tug against her, the strains produced in twisting her off the bar, and the severe gales she encountered immediately afterwards.

The abandonment of the vessel for a constructive total loss was, therefore, rightful, and the defendants are liable. There was a total loss of the freight in consequence of the same disasters.

The plaintiff has prayed for an amendment of the judgment in his favor. By an agreement of the parties, made without prejudice, the plaintiff received $1008 49 as the nett proceeds of the sale of the vessel. This sum the jury deducted from the amounts insured, and gave a verdict in favor of the plaintiff for the balance. It is now insisted that, as the defendants insured but two thirds upon the valuation, and the plaintiff was his own underwriter for the balance, the nett proceeds of the barque should be divided, as salvage, between the parties, in proportion to the amount each had at risk. This view is sustained by authority.

"If the total amount covered by all the subscriptions on policies does not equal the value of the thing insured, the assured is considered to be his own insurer to the extent of the sum not covered, and is consequently entitled, to that extent, to his proportionate share in the proceeds of the salvage. Thus, suppose A. to have insured goods, the real value of which is £1000, for £800, of which sum B. subscribes for £500 and C. for £300. A., it is plain, stands his own insurer for £200: a constructive total loss takes place on the goods, in respect of which A. abandons: the proceeds of the salvage amount to £100, *i. e.*, a *tenth part* of the whole insurable value of the goods; this salvage, there-

fore, must be distributed among the parties to the insurance in the proportion of a *tenth* of their respective interests.

To A. for his £200 uncovered by the policy................ £20
To B. for his £500 insured............................. 50
To C. for his £300 insured............................. 30
                                                        ‾‾‾‾‾
                                                        £100."

2 Arnould's Ins., *p. 1187.

It is, therefore, ordered and adjudged that the decree of the District Court be so amended as to reduce the amount allowed as a credit to the defendants for moneys received by the plaintiff on account of salvage, from the sum of one thousand and eight dollars and forty-nine cents, to the sum of six hundred and seventy-two dollars and thirty-three cents, and that, as thus amended, the said decree be affirmed with costs.